# EXHIBIT D

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
4    Paisley Park Enterprises, Inc.  )   File No. 17-CV-1212
     and Comerica Bank & Trust,      )          (WMW/TNL)
     N.A. as Personal               )
5    Representative for the Estate   )
     of Prince Rogers Nelson,        )   St. Paul, Minnesota
6                                    )   July 19, 2018
              Plaintiffs,            )   2:10 p.m.
7                                    )
     vs.                            )
8                                    )
     George Ian Boxill, Rogue Music )
9    Alliance, LLC, Deliverance,     )
     LLC, David Staley, Gabriel      )
10   Solomon Wilson, Brown & Rosen,  )
     LLC, and Sidebar Legal, PC,     )
11                                   )
              Defendants.            )
12   ------------------------------------------------------------

13

14

              BEFORE THE HONORABLE TONY N. LEUNG
15     UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

16
                   **(MOTIONS HEARING)**
17

18

19

20

21

22

23

24
          Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

1    APPEARANCES

2      For the Plaintiffs:          Fredrikson & Byron, PA
                                    LORA MITCHELL FRIEDEMANN, ESQ.
3                                   ANNE E. RONDONI TAVERNIER, ESQ.
                                    Suite 4000
4                                   200 South Sixth Street
                                    Minneapolis, Minnesota 55402
5
       For the Defendants:          Godfread Law Firm
6                                   PAUL ALLEN GODFREAD, ESQ.
                                    Suite 305
7                                   6043 Hudson Road
                                    Woodbury, Minnesota 55125
8
       (Via Telephone)              Rastegar Law Group, APC
9                                   DOUGLAS W. PERLMAN, ESQ.
                                    Suite 200
10                                  22760 Hawthorne Boulevard
                                    Torrance, California 90505
11
       Court Reporter:              LORI A. SIMPSON, RMR-CRR
12                                  Suite 146
                                    316 North Robert Street
13                                  St. Paul, Minnesota 55101

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                      IN OPEN COURT

 3            THE COURT:  This is the United States District

 4    Court for the District of Minnesota and the case before the

 5    Court today for a hearing on motions is captioned as

 6    follows:  Paisley Park Enterprises, Inc., et al. vs. George

 7    Ian Boxill, et al., Defendants, Case No. 17-CV-1212.

 8            Starting with plaintiff counsel, please identify

 9    yourself for the record and who it is that you have here.

10            MS. FRIEDEMANN:  Good afternoon, Your Honor.  Lora

11    Friedemann representing the plaintiffs, and with me at

12    counsel table is Anne Rondoni Tavernier.  We also have a

13    couple of folks in the gallery, Grant Fairbairn, a

14    colleague, and Erin Edgerton, who is a summer associate at

15    the firm.

16            THE COURT:  Welcome to court.  Thank you for being

17    here.  And I trust that represents the whole group of

18    plaintiffs?

19            MS. FRIEDEMANN:  Indeed it does.

20            THE COURT:  Okay.  Thank you.  I'm not suggesting

21    that we need more people, but just wanted to make clear for

22    the record we've got everyone covered.

23            And for defense?

24            MR. GODFREAD:  Good afternoon, Your Honor.  Paul

25    Godfread representing all appearing defendants.  I don't
```

1    have anyone else with --

2         THE COURT:  If you could speak into the mike, you

3    almost have to put your mouth right next to it, because I

4    know that we -- well, I hope we have someone on the phone.

5         MR. GODFREAD:  We do, Your Honor.  My colleague,

6    Douglas Perlman, I know is listening in on the line.

7         THE COURT:  Mr. Perlman, you're there?

8         MR. PERLMAN:  Yes, Your Honor.  Douglas Perlman

9    representing George Ian Boxill, Rogue Music Alliance, and

10   Deliverance, LLC.

11        THE COURT:  All right.  Thank you.

12        MR. GODFREAD:  Your Honor --

13        THE COURT:  Yes.  Whoever else is here, I'd love

14   to meet them.

15        MR. GODFREAD:  Well, I believe an attorney for

16   Brown & Rosen is at least here to observe.

17        MR. SIMPSON:  That's right, Your Honor.  I haven't

18   appeared in the case, which is why I am on this side of the

19   bar, not that side of the bar.  My name is Greg Simpson.

20   I'm from the Meagher & Geer firm.  We're going to be

21   entering an appearance on behalf of the Brown & Rosen law

22   firm.

23        THE COURT:  As I understand it, you will have the

24   pleasure of being on this side of the bar soon, right?

25        MR. SIMPSON:  Yes, we will be having that pleasure

```
 1    soon.

 2              THE COURT:  Okay.  Very well.  Anyone else?  Thank

 3    you.  In the back?

 4              UNIDENTIFIED SPEAKER:  Just an intern for Judge

 5    Nelson.

 6              THE COURT:  Well, welcome to court.

 7              All right.  I don't know where to start because

 8    they're sort of related motions.  I guess let's go with the

 9    first filed.

10              Moving party, I think Ms. Friedemann, do you want

11    to go first on yours?

12              MS. FRIEDEMANN:  Yes.  Thank you, Your Honor.

13              THE COURT:  You know, obviously I've gone over all

14    the materials, so I hope I'm not squeezing the lawyers too

15    much, but about 20 minutes aside on both motions and you --

16              MS. FRIEDEMANN:  That's more than enough.

17              THE COURT:  -- can split the time however you

18    want.

19              MS. FRIEDEMANN:  Thank you.  Well, as you know,

20    Your Honor, we are here today seeking basic discovery.  And

21    rather than answer our concerns, the response only raises

22    more questions.

23              The motion really relates to four things:  RMA's

24    deficient document production, RMA's deficient written

25    responses to our requests for production, RMA's deficient
```

1    privilege log, and then the scope of the defendants'

2    privilege waivers.  And I'll address the issues in that

3    order.

4            Starting, then, with the deficient document

5    production, we're requesting that the Court order RMA to

6    make a complete production.  And we know the production is

7    not complete because we've received documents from other

8    parties that none of the defendants have produced.  We gave

9    some examples in our briefing.

10           One was text messages.  We have received some text

11   messages from a nonparty to the case, Rogers & Cowan, who

12   was the PR firm for the defendants, and those are very

13   relevant messages that show that the principals of RMA were

14   using texts to communicate with each other and with third

15   parties.  RMA has not produced those text messages and said

16   nothing about this in their response whatsoever.

17           Just recently we received documents from Apple in

18   response to a subpoena and the Apple documents include

19   e-mails with RMA representatives that we've never seen

20   before.  Those documents should be -- should already have

21   been produced by RMA here.

22           Finally, as another example, David Staley, one of

23   the principals of RMA, submitted an affidavit in this action

24   way back when.

25           And I apologize.  I have this nasty cough and I

1    hope I won't have a major coughing fit.  If so, I have

2    lozenges with me, but I hope to get through it without

3    that.

4          Mr. Staley submitted this affidavit, it's Docket

5    No. 26, and it purports to represent how much money the

6    defendants have spent on various categories of things

7    relating to the release of this disputed music.

8          Paragraph 6, for example, says they've spent

9    98,000 on production costs to complete the music.  We'd

10   expect to see those documents, the documents that show what

11   the production was and then of course the accounting, the

12   documents that show -- that add up to that 98,000.  We asked

13   specifically for those and we haven't received them.

14         Now, these are only examples.  We had to bring

15   three motions to compel, three successful motions to compel,

16   in the co-pending arbitration just to obtain basic

17   information from Mr. Boxill and Deliverance, LLC.  RMA did

18   not participate in discovery in the arbitration and here

19   they're being evasive and nonresponsive and even ignoring

20   requests to meet and confer.

21         So the primary argument that was in the opposition

22   was the notion that their production would have been the

23   same as another party, the Defendant Deliverance, LLC, and

24   why bother to produce the same documents for both parties.

25   And that response does not work for two reasons.

1           The first is the parties agreed that they would

2     produce documents, each party would produce documents with a

3     separate Bates prefix.  It comes right out of our ESI

4     stipulation, which is at Docket No. 141, and I will put it

5     on the screen for us to look at.

6           So the part that I have highlighted here, it's

7     paragraph 3 on page 2, is directly on point.  It says images

8     shall be endorsed with a Bates prefix and each producing

9     entity shall use a unique Bates prefix.  It even says maybe

10    RMA for Rogue Music Alliance.

11          And that's not just makework.  We use those Bates

12    prefixes in litigation as just a convenient way of telling

13    where the document came from, and without it it would look

14    to us like documents came out of the files of the party who

15    had the Bates number on it rather than RMA's files.  So they

16    do need to be produced.

17          THE COURT:  It's sort of a practical question

18    almost.  In this case some of the documents would have been

19    produced in connection with the arbitration, right?

20          MS. FRIEDEMANN:  Correct.

21          THE COURT:  Are you asking to sort of renumber

22    those as well, or what are you thinking?

23          MS. FRIEDEMANN:  No, I don't think they would need

24    to be renumbered if they were produced by RMA, but what we

25    don't want is confusion about where -- what the source of

1    the collection was.  And the defendants seem to think that

2    RMA and Deliverance are interchangeable.  I guess they can

3    do it how they want to do it, but --

4          THE COURT:  Your more specific concern is to make

5    clear that even though it may have been produced in that

6    other litigation, it was by another party, legal party, and

7    you want to confirm that, well, this party also had these

8    documents?

9          MS. FRIEDEMANN:  Correct, Your Honor.  Just as a

10   practical example, we will eventually take depositions of

11   the principals of Rogue Music Alliance and when I'm

12   presenting a witness with a document, I want the Bates

13   number RMA on it.  It's convenient for all of the lawyers

14   then and the parties to understand that that is, in fact, a

15   document that came from the witness's files.  And so we do

16   think they need to be produced.

17         THE COURT:  So how much does that cost?  Let's say

18   there's 5,000 documents.  I have had the good or bad luck of

19   not actually litigating a case from a litigator's side.

20   What does something like that cost, to put another stamp on

21   it with --

22         MS. FRIEDEMANN:  Well, if the document -- the

23   expensive part is the actual collection and review, which at

24   least the other side would say they've already done for at

25   least this -- the set of documents they have produced.  And

1    so simply having your system attach another Bates label to

2    it and produce a production is a relatively easy thing to

3    do.

4            So I didn't give you a specific number and that is

5    because I don't feel as though I can here today actually say

6    it would be this much money, but it's very minor in the big

7    scheme of things.

8            THE COURT:  In the scheme of overall billing and

9    costs?

10           MS. FRIEDEMANN:  In the scheme of overall billing,

11   that is one that I wouldn't blink -- it's not worth the

12   blink of an eye.

13           But really the more important problem here is

14   whether all of the documents have actually been collected.

15   You know, we do think they need to be properly marked, but

16   we don't have the full set here even including the argument

17   that all of the Deliverance documents are also the RMA

18   documents.  We know that because the examples I gave you are

19   documents we haven't seen yet from any party.  And so we

20   need to sort of go back to square one here.  We need a

21   competent collection.

22           The response from RMA raises some questions,

23   frankly, about the way the collection was done here because

24   they said they collected from a single source.  Now, Your

25   Honor referenced that you didn't have the experience of

1    working in the trenches as a litigator, but I'm sure you're

2    well aware that a collection includes collecting from

3    individual custodians who may have relevant information.

4           In this case there are at least seven employees of

5    RMA that have been -- that were involved in the release of

6    the album.  I have their names here, but I don't know that I

7    need to identify them in this setting.  But the collection

8    should include all of those folks.  You don't just go get

9    documents from one person, because others may have different

10   documents within the scope of the same entity.

11          So the indication that they collected only from a

12   single source says to us you didn't get the full scope of

13   documents, including -- but beyond that, the obligation to

14   collect also includes documents within the possession,

15   custody, and control of RMA, including former attorneys, and

16   we don't believe that RMA has made any attempt to collect

17   documents from its former counsel.  So that's the bigger

18   problem, but we have both in play here in terms of the

19   document production to date.

20          THE COURT:  Are you ready to segue into that,

21   then?

22          MS. FRIEDEMANN:  On the privilege issues?

23          THE COURT:  Or if you've got more, that's fine.

24          MS. FRIEDEMANN:  No, I'm done with that particular

25   topic.  There are -- let me cover the two that I can do

1   really quickly and then finish with the privilege waiver.

2          The deficient written responses to the requests

3   for production, this is sort of basic Rule 34 stuff.  When

4   you're asserting an objection, if you withhold documents

5   based on that objection, you have to say so.  These written

6   responses don't comply.  The reason for the rule is

7   transparency.  If they are withholding things based on some

8   of the objections they've raised, they need to tell us and

9   then, of course, if we can't work it out we bring the issue

10  to Your Honor.  But they haven't given us that information.

11  Instead it looks like they've made judgments as to what they

12  think we should be entitled to receive, not what we asked

13  for, and that simply won't do.  So we're asking the Court to

14  require that they supplement their answers to comply with

15  Rule 34.

16          On the privilege log, there isn't much to say

17  there.  They agree they owe us one.  The one they gave us

18  was at best incomplete, at worst just downright false.  We

19  don't have a privilege log from this party and we've been

20  asking for it for months.  So we'd ask the Court to require

21  that they give us one and that it has sufficient information

22  for us to assess the claims of privilege and then whether

23  they fall within the scope of the waivers.

24          So then the final issue is the privilege waivers.

25  And as the Court knows from our papers, the parties agree

1    that there has been subject matter waiver here on at least

2    three topics:  the decision to release this music over the

3    estate's express objection, the defendants' purported

4    good-faith belief that they had the right to exploit the

5    estate's intellectual property, and then the defendants'

6    interactions with the estate.  What's in dispute and before

7    the Court is whether the defendants can choose to waive from

8    some lawyers and not other lawyers.

9              What I want to focus on today is a decision from

10   this district that I think is particularly instructive, and

11   that's the *Fagen vs. Exergy Development Group* case.  The

12   cite is 2015 Westlaw 12977507, a decision by Judge Rau in

13   2015.

14             So like this case, *Fagen* involved a situation

15   where there was a law firm.  It was the Hawley Troxell firm

16   who wrote an opinion letter and then that same firm appeared

17   as lead counsel in the litigation.  A separate firm, in that

18   case the Faegre firm, appeared as local counsel.  And the

19   question before the court was whether the waiver of

20   attorney-client privilege for communications with the lead

21   and opinion counsel, the Hawley Troxell firm, extended to

22   communications involving the Faegre firm.  It's essentially

23   the same fact pattern that we have here.

24             And the court held that the waiver for the lead

25   counsel extended to the firm that served as the local

1    counsel for both the attorney-client privilege and the work

2    product doctrine for two reasons.

3         The first is the basic sword and shield problem

4    where you can't choose to release some opinions and some

5    communications and then, you know, cover the rest up.  And

6    even though the communications at issue in that decision

7    were litigation related, it was advice relating to the

8    lawsuit, the court still found that that general doctrine

9    held true.

10         The second reason was agency.  The local counsel

11   was acting as an agent for the lead counsel, this court held

12   in Fagen, and therefore the waiver as to lead counsel

13   extended to the lawyers acting as their agents.

14         We submit that both rationales apply here.

15   Brown & Rosen, like in that case, was opinion counsel and

16   then also lead litigation counsel during the first months of

17   this case.  The Merchant and Leventhal firms were local

18   counsel working with the Brown firm and may also have

19   communicated on the subject matters for which privilege has

20   been waived and those communications need to be produced.

21         I'd say that Merchant & Gould in particular was in

22   a position where it appears likely that they would have had

23   some communication on the subjects where privilege has been

24   waived.  They were actively representing the defendants when

25   the decision to release was made and they were also involved

1    in representing the defendants when the decision -- we

2    demanded that they cease some infringing conduct and they

3    did, in fact, pull conduct from the princerogersnelson.com

4    website and it appears that Merchant was involved in that.

5    So if they were -- if there are communications on the

6    subject matters that are clearly within the scope of those

7    waivers, those need to be produced.

8          It isn't clear from the papers whether there's a

9    dispute before this Court about whether the defendants are

10   obligated to go collect those documents.  The case law from

11   this court, as Your Honor knows, is very clear that

12   documents in a lawyer's files are within the possession and

13   custody and control of the client.  So we submit that the

14   defendants here had the obligation to go get these records

15   from their former attorneys.

16         The defendants haven't responded to that argument,

17   so I'm not sure that that's really disputed here, but

18   nonetheless, it does not appear that they have taken any

19   actions to try to collect from any of the former firms,

20   including the Brown & Rosen firm and the Sidebar Legal firm.

21         So for those reasons, Your Honor, our motion to

22   compel should be granted in full and the cross motion to

23   quash and for a protective order should be denied.  And I'll

24   reserve some time to respond to my colleague if needed.

25         THE COURT:  Okay.  Very well.  Thank you for your

1    argument.

2           MS. FRIEDEMANN:  Thank you.

3           THE COURT:  Again if you could state your name for

4    the record, speaking into the microphone.

5           MR. GODFREAD:  Paul Godfread appearing on behalf

6    of defendants.

7           Your Honor, if you would prefer one motion first

8    over the other or --

9           THE COURT:  Up to you, Counsel.

10          MR. GODFREAD:  All right.  Thank you.  Perhaps

11   I'll take them in reverse order since it may be freshest in

12   mind about the scope of the waiver and protective order.

13          Some of -- I think the plaintiffs' argument here

14   is a bit of a red herring.  There isn't really an issue

15   between whether or not it's a specific firm that is within

16   the scope of the waiver for specific subject matters.  The

17   scope of the waiver being the opinion rendered that

18   defendants relied upon in releasing the music at least on a

19   very simple level seems to be agreed upon by the parties.

20          The problem is, using that waiver, plaintiffs are

21   now attempting to reach further and invade further into

22   attorney-client privilege without any reasonable basis in

23   fact for making the assumption that either the Merchant &

24   Gould firm or the Leventhal firm provided any such

25   information that would be within the scope of the waiver.

 1    In fact, the timing of representation and the release would

 2    suggest that they would not have done that.

 3            And certainly as to the Leventhal firm, as they

 4    became involved far later than the release of the music, I

 5    can't see a compelling reason and I don't see anything in

 6    their briefing to suggest why there would be any reason to

 7    believe that there would be waived subject matter in the

 8    possession of the Leventhal firm.

 9            As to the release and the decision to release, I

10    believe plaintiff is playing a little bit fast and loose

11    with the facts and the record.  In fact, on page 7, the only

12    thing I'm reading from this in their motion is -- or their

13    motion memorandum to suggest that is that Merchant just was

14    local counsel representing them at the moment of the

15    release.

16            Continuing throughout -- on page 12 I guess

17    there's another representation that because Merchant & Gould

18    was local counsel at the time the release was made, that

19    somehow it would necessarily be that they rendered some

20    opinion about the viability of such release.

21            THE COURT:  It may not necessarily be, but could

22    they have?

23            MR. GODFREAD:  Well, and I think actually

24    plaintiff knows they hadn't because the --

25            THE COURT:  That they hadn't?

1          MR. GODFREAD:  That they had not.

2          They are premising this on the decision to

3     release.  The decision to release had been made months

4     earlier, and plaintiff knows this because they had been in

5     discussions with the Brown & Rosen law firm about the

6     release.  And, in fact, the very lawsuit and TRO motions

7     that brought Merchant & Gould in as representation were

8     premised on the fact that that decision to release had

9     already been made.

10          THE COURT:  Let me ask you this.  Give me a

11     little -- timing-wise just update me.  So the arbitration

12     had started, the TRO relating to this case had been filed,

13     and then the release occurred, right?

14          MR. GODFREAD:  Correct, Your Honor.  It's a pretty

15     compressed timeline, but I think the issue here is whether

16     or not the decision to release had been made.  And I think

17     there's further conflation as to what Merchant & Gould did

18     in response to --

19          THE COURT:  At the time of the release, was

20     Merchant already retained?

21          MR. GODFREAD:  At that time they were, but the

22     decision to release had been made.

23          THE COURT:  And what about Leventhal, PLLC?

24          MR. GODFREAD:  No, Leventhal I don't believe had

25     been retained until many months later.

1          THE COURT:  Okay.  Thank you.

2          MR. GODFREAD:  The release had already happened,

3     the TRO motion had already happened and been decided long

4     before Leventhal became involved.

5          At best -- I think actually there are different

6     subject matters that plaintiff is now seeking discovery

7     into, such as what did defendants later do once they

8     received a demand from the Fredrikson law firm.  That's

9     actually a somewhat different issue than did you decide to

10    release this music in the first place or what was the

11    response to a TRO that was granted.

12         The fact that they may have changed their website,

13    taken material down is a completely different decision and

14    based on completely different facts than the original

15    decision, you know, there's joint authorship or is there not

16    joint authorship and can you release it.  They are

17    completely different legal issues.

18         And I think to sort of stretch that initial

19    privilege waiver where the defendants released and decided

20    to release because of the opinion of the Brown & Rosen firm,

21    to say that now covers anything having to do with the

22    release or subsequent removal or anything to do with the IP

23    rights relating to the *Deliverance EP*, it sort of makes the

24    subject matter eat the whole case rather than just be the

25    narrow topic in which a waiver may have occurred.  I think

1    that's the only reason -- or the only way plaintiff gets

2    what they have, is to just basically expand this subject

3    matter to be the scope of the entire case.

4          THE COURT:  Now, you mentioned that a waiver may

5    have occurred.  There is no real dispute with respect to

6    Brown & --

7          MR. GODFREAD:  Brown & Rosen, Your Honor.

8          THE COURT:  -- Rosen with respect to those three

9    topics; is that correct?

10          MR. GODFREAD:  Correct, Your Honor.

11          THE COURT:  All right.  Thank you.

12          MR. GODFREAD:  I had not anticipated that

13   plaintiffs would interpret that initial opinion to mean

14   that, well, then any subsequent opinions having anything to

15   do with the release or decision to take down while

16   litigation is pending -- maybe we do, in fact, have a

17   dispute on how big that waiver subject matter is, but

18   generally speaking the subject matter, I think the parties

19   are in agreement that, yes, there is waiver as to that

20   opinion.

21          And I think likewise on the discovery issues,

22   there's a little bit of stretching or twisting of the facts.

23          Change gears here a little bit, Your Honor.  I

24   believe you had asked plaintiffs if there would be a

25   substantial cost in reproducing the same documents with a

1    different Bates stamp.  I think those costs would, in fact,

2    be fairly significant, at least from defendants' viewpoint.

3          THE COURT:  What if -- as I understood it from

4    plaintiff counsel, basically to the extent that documents

5    have already been produced in connection with the

6    arbitration, that in essence they would basically like a

7    marking, as set forth in the earlier agreement, with who it

8    is that produced this document, again, to indicate, oh,

9    yeah, this specific entity actually had this document.  I

10   mean, it seems like that would literally be --

11         MR. GODFREAD:  That may be --

12         THE COURT:  Somehow changing a computer setting

13   and the cost of 5,000 pages at a time to, you know, enter

14   that thing, it could be very administratively done, I would

15   think.

16         MR. GODFREAD:  Your Honor, I think to some extent

17   it may be more complicated and costlier than that using the

18   e-discovery software that defendants' counsel has been

19   using, but --

20         THE COURT:  So if we didn't have the software, we

21   could take the hard copies of 5,000 pages and we could scan

22   them and then we could, using Word, probably put on the

23   bottom of each page, maybe even like with one -- a couple of

24   strokes.  Wouldn't that --

25         MR. GODFREAD:  Perhaps, Your Honor.  I'm not sure

```
1       what the purpose of --

2              THE COURT:  Why don't we forget the software and

3       just do the hard copies then?  Because I think I could

4       actually get that done.

5              MR. GODFREAD:  Well, Your Honor, that's a

6       possibility, but I think also the premise of this whole idea

7       is based on maybe a misunderstanding of the nature of the

8       parties.

9              Deliverance, LLC is essentially a holding company

10      for the release of this EP.  Many of the parties -- the

11      employees or people who would have access to the actual

12      documents would be many of the same people involved for both

13      Boxill, RMA, and Deliverance.  It's not that they would be

14      entitled to additional documents.

15             I think in essence, yes, maybe the scope of how

16      much time does it take to remark documents is an issue of

17      cost, but I also don't think there's any legitimate

18      discovery purpose for it.

19             If they needed further information or

20      certification on chain of title or where do these documents

21      come from, perhaps that might be something worth discussing,

22      but, as I understand it, that hadn't really been discussed,

23      you know, between the counsel for parties prior to this

24      motion.

25             THE COURT:  In Section 3A of the document -- is
```

1    that the protective order that was earlier shown?  Which

2    document is that?  I don't have the top of the document.  I

3    just have the --

4              MR. GODFREAD:  That is Document 141, I believe.

5              THE COURT:  It talks about different

6    identification, so it seems like it would be still

7    consistent.  This isn't a new request, is it?  It would be

8    consistent with that protocol, wouldn't it?

9              MR. GODFREAD:  At least in part, Your Honor.  I

10   think, though, the fact that they come from -- the same

11   documents are available to these two related corporate

12   entities, one being the holding company for the release and

13   the other being the record company, I guess I'm not really

14   sure what the value of just merely remarking, even if it is

15   more to the letter consistent with what we discussed

16   earlier --

17             THE COURT:  Theoretically it would tell who had

18   what document.  Multiple parties could have had the same

19   document.  And so I can envision in the heat of trial as

20   people are flipping through documents, it's a lot easier to

21   have, oh, this has got the Bates number, this came from this

22   person and then this one -- didn't you also have this

23   document?  Because then you would have the one with the

24   Bates lead that shows it came from Party Y instead of A, in

25   addition to Party X.  In terms of putting on -- in terms of

1     actual litigation, that actually could be quite useful.  I

2     mean, during the heat of the battle there's a lot of stuff

3     flying around.  It helps.

4            MR. GODFREAD:  Possibly, Your Honor, but I think

5     at least as to the documents that either RMA or Deliverance

6     would have, we are still basically talking about the same

7     documents.

8            So even then, knowing that, I don't think there

9     would be any new information gained by just saying, well,

10    now that we know that, we can just -- one copy of the

11    document that says RMA and a different copy that says

12    Deliverance.

13           I don't see the discovery value or even the

14    litigation value of just saying -- knowing that they would

15    basically be the same set of documents, having two different

16    copies of it just to clarify -- I don't even think that

17    would clarify because we would already know that a document

18    that Deliverance had wouldn't necessarily also have been

19    possessed by Deliverance -- or by RMA, excuse me.

20           And I don't know if I have -- I think essentially

21    there are some aspects of it -- the privilege log we've

22    already conceded we need to revise and expand.  Privilege

23    log, that much I don't think is truly at issue.

24           But the remainder of the motion to compel seems to

25    be literally nothing more than busywork.  The scope of the

```
1    expense, I'm not sure I have a clear idea of exactly how
2    many hours or how much time it would take to remark these
3    documents, but I can't possibly see any actual informational
4    value or discovery purpose in going through the motions of
5    doing that.
6              THE COURT:  Well, have you gone through and
7    compiled the list of documents that were produced and have a
8    cover sheet that says all these documents we were in
9    possession of, that was already produced in prior AAA
10   litigation?
11             MR. GODFREAD:  I think so, Your Honor, and I think
12   we could -- I think my colleagues, Mr. Perlman and
13   Mr. Hartley, have been taking the lead in discovery.  They
14   would have the firsthand knowledge of what exactly has been
15   done in discovery to date.  But I think such a
16   certification, if that would be helpful, it would certainly
17   be possibly more useful and less time-intensive.
18             THE COURT:  Normally who puts on the Bates number?
19             MR. GODFREAD:  What's that?
20             THE COURT:  Who puts on the Bates number?
21             MR. GODFREAD:  I believe Mr. Hartley has taken
22   care of that to date, at least the discovery -- e-discovery
23   software suite that Mr. Hartley has been using has taken
24   care of that.
25             THE COURT:  Okay.
```

```
 1              MR. GODFREAD:  And I'll reserve maybe what balance

 2     of time I have.  Thank you, Your Honor.

 3              THE COURT:  Yep.  Thank you.

 4              Response?

 5              MS. FRIEDEMANN:  Just very briefly, Your Honor.

 6     The question was raised as to, you know, do we actually have

 7     a reasonable basis for believing that the Merchant and

 8     Leventhal firms could have documents that fall within the

 9     scope of the waivers.  Yes, we do.

10              As the Court noted, the Merchant firm was

11     representing the defendants during the period of time when

12     the final release -- the final decision to go forward with

13     the release of the music was made.

14              The Merchant firm also represented the defendants

15     during some of the exploitation of the estate's intellectual

16     property and may very well have either communicated with the

17     defendants directly or with Mr. Brown on that subject.

18              With respect to the Leventhal firm, they were not

19     in the case when the decision to release was made.  We also

20     didn't ask for documents relating to that decision because

21     we didn't expect the Leventhal firm would have them.

22              Our request as to the Leventhal firm focused,

23     again, on any communications regarding the alleged

24     good-faith basis for exploiting the estate's intellectual

25     property rights.  The Leventhal firm certainly could have
```

1    communicated on that subject.

2            Of course, we don't have any visibility into

3    whether they did or didn't, but the defendants would and the

4    fact of the matter is they simply have not looked and it's

5    something that one would think they would have done and that

6    they, in fact, have an obligation to do under the rules.

7            That's all I have, Your Honor.

8            THE COURT:  Thank you, Counsel.

9            Any reply?

10           MR. GODFREAD:  Just briefly as to the scope of

11   waiver -- or actually more specifically the scope of the

12   subpoenas, if these were document requests that related

13   specifically to an opinion relating to release or were time

14   limited up to the release, you know, there might be some

15   merit to what plaintiffs are saying.

16           But as it is, they are basically asking for

17   anything having to do with, you know, the IP in general

18   terms and far too broad and far too detached from the more

19   specific time period where there's at least a theoretical

20   possibility that at least the Merchant & Gould firm could

21   have rendered such an opinion.

22           I don't see how there's even any theoretical

23   possibility that a release memorandum would have come from

24   the Leventhal firm at all or at least not one that has any

25   bearing on the privilege waiver so far.

```
 1                    Thank you, Your Honor.

 2              THE COURT:  Okay.  Thank you.

 3              All right.  Folks, let's take a -- we better take

 4     a half an hour recess and then we'll reassemble.  So grab

 5     coffee, go take a break, whatever, but please don't go home.

 6     Come back here half an hour from now.  Thank you.

 7              And those on the phone, you might want to just

 8     keep the line open, if you want, and then that way we won't

 9     have problems finding you again.  It's up to you, obviously,

10     the level of participation, but we plan to be back on the

11     record in about half an hour.

12              MR. PERLMAN:  Thank you, Your Honor.

13              THE COURT:  Okay.  Thank you, folks.  We are in a

14     temporary recess.

15         (Recess taken at 2:46 p.m.)

16                         *    *    *    *    *

17         (3:27 p.m.)

18                           IN OPEN COURT

19              THE COURT:  Okay.  Thank everyone's patience.  And

20     folks on the phone, who is on the phone right now?

21              MR. PERLMAN:  Douglas Perlman for defendants, Your

22     Honor.

23              THE COURT:  Okay.  Mr. Perlman, thanks for hanging

24     in there with us.  The rest of the folks are assembled.

25     Maybe just have lead counsel identify your presence.
```

1          MS. FRIEDEMANN:  Lora Friedemann present, Your

2     Honor.

3          MS. TAVERNIER:  Anne Rondoni Tavernier present.

4          MR. GODFREAD:  And Paul Godfread, Your Honor.

5          THE COURT:  Thank you.  We are back on the record

6     in the case of Paisley Park Enterprises, Inc., et al. vs.

7     George Ian Boxill, et al., Case No. 17-CV-1212.  We've been

8     here on two motions and we heard arguments.

9          This is the order of the Court.  No written order

10    will follow.  This is an oral order, so please take good

11    notes.

12          Plaintiffs and defendants have filed interrelated

13    discovery motions.  Plaintiffs seek to compel Rogue Music

14    Alliance to produce discovery.  Plaintiffs also seek

15    documents from Rogue Music Alliance, Boxill, and

16    Deliverance, LLC that fall under defendants' waiver of the

17    attorney-client privilege.  Defendants seek to quash

18    subpoenas issued to their former trial counsel on the

19    grounds that the attorney-client privilege has not been

20    waived as to Merchant & Gould and Leventhal, PLLC.

21          Looking first at the discovery not subject to the

22    attorney-client privilege arguments, defendants have no

23    substantive objection to plaintiffs' motion, but instead

24    note that the discovery requested has, in fact, been

25    produced, albeit it by Deliverance, LLC instead of Rogue

1    Music Alliance.

2         The Court agrees with defendants' argument that

3    plaintiffs are possibly advancing a discovery dispute of

4    form over substance.  While under best practices Rogue Music

5    Alliance should have at least updated its discovery

6    responses to refer to various documents produced by

7    Deliverance, LLC, the reality is that plaintiffs already

8    have the bulk of the documents they seek and requiring a

9    duplicate production and renumbering each document would

10   cost more.

11        Plaintiffs may treat Deliverance, LLC's discovery

12   production as Rogue Music Alliance's discovery production

13   given the interrelated nature of the two entities and the

14   prior arrangement that discovery produced in the arbitration

15   case could be used in this case.

16        In lieu of reproducing and renumbering documents

17   that have already been provided to plaintiffs in the

18   arbitration, any defendant that claims discoverable

19   documents have already been produced in the arbitration

20   shall confirm and identify which documents have already been

21   produced in the arbitration and that such defendant had

22   possession of such documents.

23        The Court notes, however, that the previous

24   production of Deliverance, LLC does not relieve Rogue Music

25   Alliance of its continuing discovery obligations.  For

1    example, plaintiffs assert no text messages have been

2    produced, although it suspects relevant text messages exist.

3    Plaintiffs also assert no documents have been produced from

4    the time period of April 25th to May 30, 2016, which

5    plaintiffs believe was the start of defendants' discussions

6    concerning exploitation of the Prince recordings.

7         To the extent any defendant, including without

8    limitation, Deliverance, LLC or Rogue Music Alliance or Ian

9    Boxill, have responsive discovery to plaintiffs' discovery

10   requests, the discovery should be timely produced.

11        The Court now turns to the discovery that may be

12   subject to the attorney-client privilege.  There is no

13   dispute that defendants have waived the attorney-client

14   privilege as to three topics.  These include, for example,

15   waiver as to Attorney Chris Brown's advice concerning the

16   release of the *Deliverance EP.*  This included, for purposes

17   of example and not limitation, advice related to releasing

18   the album for commercial sale, the decision to release the

19   album only in the United States, and negotiating with the

20   Prince estate concerning a license for the release.

21        There is also no serious dispute that defendants

22   have waived the attorney-client privilege as to Attorney

23   Matthew Wilson's legal opinions related to Boxill's asserted

24   ownership interests in the music contained in the

25   *Deliverance EP.*

1            The dispute between the parties, then, is whether

2     the waiver is limited only to the legal advice of Attorneys

3     Brown and Wilson or whether it extends to all of defendants'

4     various counsel.  Plaintiffs' subpoenas to Merchant & Gould,

5     PC and Leventhal, PLLC hinge on this issue.

6            It is well-established under common law that

7     confidential communications between an attorney and a client

8     are privileged and not subject to disclosure absent consent

9     of the client.  *United States vs. Horvath*, 731 F.2d at 562,

10    (Eighth Circuit 1984).

11           Under Federal Rule of Evidence 502(a), waiver of

12    this privilege extends to the disclosed and undisclosed

13    communications or information concerning the same subject

14    matter and when they ought to, in fairness, be considered

15    together.

16           The purpose of the subject matter waiver doctrine

17    is to prevent a party from using the advice he received as

18    both a sword, by waiving privilege to favorable advice, and

19    a shield, by asserting privilege to avoid -- to unfavorable

20    advice.  We look to the *Shukh vs. Seagate Tech*, *LLC* case,

21    848 F.Supp.2d at 990 (District of Minnesota 2011).

22           The widely-applied standard for determining the

23    scope of a waiver of attorney-client privilege is that the

24    waiver applies to all other communications relating to the

25    same subject matter.  *Fort James Corp. vs. Solo Cup Co.*,

1    412 F.3d at 1349 (Federal Circuit 2005).

2          Essentially the Court's analysis boils down to

3    determining whether fairness dictates the expansion of

4    defendants' waiver.  Again the *Shukh* case, 848 F.Supp.2d at

5    990.

6          Here fairness dictates that the subject matter

7    waiver extend beyond merely Attorneys Brown and Wilson to

8    reach Merchant & Gould, PC up to the release date of the

9    *Deliverance* music.

10         While the Court is aware that Merchant & Gould was

11   primarily hired as counsel to defend this lawsuit as

12   compared to Attorneys Brown and Wilson, who primarily

13   rendered pre-lawsuit advice, activity relating to the

14   release of the *Deliverance EP* did not cease when the

15   lawsuit, as well as the arbitration, was initiated.  In

16   fact, the alleged wrongful release occurred after

17   plaintiffs' TRO had been filed in this case.

18         Merchant & Gould, PC was representing defendants

19   at the time a *Deliverance* track was released on April 18,

20   2017.  Given that Merchant & Gould, PC was representing

21   defendants at the time the music was released, the

22   reasonable possibility exists that Merchant & Gould rendered

23   legal advice to defendants concerning their legal rights

24   related to the release of the *Deliverance* music or

25   defendants' ownership rights in these songs.  Such discovery

1   would go toward the issue of willfulness, good faith, and

2   possibly other relevant topics in this litigation.

3          Given defendants' waiver related to the opinions

4   on release and ownership interests, any opinions rendered by

5   Merchant & Gould prior to the release of the *Deliverance*

6   music on April 18, 2017 ought to be considered together with

7   the advice rendered by Attorneys Brown and Wilson.

8   Accordingly, plaintiffs are entitled to probe this

9   possibility in discovery.

10          The waiver, however, does not extend past the

11  April 18, 2017 release date.  It is logical that after the

12  music was released opinions rendered by defendants' counsel

13  would not have related to the release itself, but rather a

14  myriad of other matters, such as compliance with the Court's

15  TRO.

16          Moreover, this time period overlaps with the start

17  of this litigation in earnest and this Court will not permit

18  plaintiffs the opportunity to delve into defendants' trial

19  advice and strategy.

20          Likewise, the waiver does not reach Leventhal,

21  PLLC given that Leventhal, PLLC was retained to replace

22  Merchant & Gould well after the release of the *Deliverance*

23  music.

24          In sum, defendants have waived the attorney-client

25  privilege with respect to legal advice concerning the

1    release of the *Deliverance EP* and Boxill's asserted

2    ownership interests in the music contained on the

3    *Deliverance EP*.  This waiver extends to the April 18, 2017

4    release date of the *Deliverance* music.

5                As such, the subpoena issued to Merchant & Gould

6    PC is upheld, but is limited to responsive discovery from

7    the release on April 18, 2017 and earlier.  The subpoena is

8    quashed as to Leventhal, PLLC.

9                Further, as discussed at the start of the Court's

10   oral order, defendants must engage in a good-faith effort to

11   collect and produce responsive documents to plaintiffs'

12   discovery requests.

13               To the extent defendants have any discovery

14   responsive to plaintiffs' discovery requests that they seek

15   to withhold on attorney-client privilege grounds outside the

16   scope of the waiver as outlined in the Court's ruling today,

17   defendants shall provide an updated privilege log, as they

18   acknowledge in their memorandum.

19               Defendants shall ensure their privilege logs

20   provide sufficient detail so plaintiffs and the Court can

21   assess whether the claim of privilege is valid from the

22   entries in the log itself.  *Chevron Corp. vs. Weinberg*,

23   286 F.R.D. at 98, (District D.C. 2012).

24               Thus, plaintiffs' motion to compel discovery from

25   Defendants Boxill, RMA, and Deliverance, ECF No. 264, is

1       granted and defendants' motion to quash subpoenas directed

2       by plaintiffs to defendants' trial counsel, Merchant &

3       Gould, PC and Leventhal, PLLC, or in the alternative for a

4       protective order, ECF No. 294, is granted in part and denied

5       in part.

6                As noted, no written order will follow.

7                Finally, the Court notes that it is in receipt of

8       the parties' July 18, 2018 letter, ECF No. 302, which

9       requests a rescheduling of the August 10, 2018 settlement

10      conference given the anticipated appearance of several new

11      defendants.

12               The Court agrees that the settlement conference

13      should be rescheduled so that all parties may participate;

14      therefore, the Court cancels the August 10, 2018 settlement

15      conference and directs the parties to contact chambers, once

16      all the new defendants have appeared, for purposes of

17      rescheduling the settlement conference.

18               That concludes this session of the Court.  Thank

19      you, everyone, for their patience waiting for the Court's

20      decision.  And thank you both sides for your well-presented

21      arguments as well as written briefs.

22               We are in recess.  Thank you.

23          (Court adjourned at 3:40 p.m.)

24                        *        *        *

25

1

2

3          I, Lori A. Simpson, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7               Certified by:   *s/ Lori A. Simpson*

8                               Lori A. Simpson, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25